WILLIAM H. WILSON *et al.*, for the use of Simon Otis, *Plaintiffs in Error*, v. CHARLES JERNIGAN, *Defendant in Error*.

1.   In passing upon an assignment questioning the correctness of the ruling of the trial court in denying a motion for new trial which is based upon the sufficiency of the evidence to sustain the verdict, the guiding principle for an appellate court is not what it may think the jury *ought* to have done or what such court may think it would have done had it been sitting as a jury in the case, but whether as reasonable men the jury could have found such verdict.   If this question can be answered in the affirmative, the action of the trial court upon such motion should not be disturbed.

2.   The verdict of a jury should be comformable to legal rules and defensible in point of sense; it must not be absurd or whimsical.   But an appellate court is not warranted in substituting its standard of what is reasonable for that of the jury.   If reason-

able men might have found the verdict in question, and it has received the sanction of the trial court, an appellate court should not disturb it.

3. The refusal of the trial court to grant a new trial for insufficiency of the evidence to sustain the verdict, or because the verdict is contrary to the evidence, will not be reversed unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the appellate court that it is wrong and unjust.

4. When the trial court concurs in the verdict rendered by a jury by denying the motion for a new trial, and there is evidence to support it, an appellate court should refuse to disturb it, in the absence of any showing that the jurors must have been improperly influenced by considerations outside the evidence.

5. The trial court is authorized to regulate the order of the introduction of evidence, and its discretion in this matter will be interferred with by an appellate court only when an abuse thereof is clearly made to appear.

6. If evidence apparently incompetent only because its relevancy is not apparent, or because it is not the best evidence, is offered, the trial court may, in the exercise of its discretion, receive it conditionally, if the counsel offering it gives assurance that he will supply the necessary foundation afterwards. If, however, such evidence is so conditionally received, and the necessary connecting evidence is not introduced, so as to show the relevancy of the admitted evidence, the court should exclude the evidence so received on its own motion, but if the failure to connect be not apparent or glaring, the objecting party should move to exclude it.

7. Where no objection is made at the trial to the admission of evidence, it is considered as received by consent and objections if any to the evidence are waived, and the appellate court will not ordinarily consider an assignment of error based on the admissibility under the rules of legal procedure of the evidence so admitted without objection.

8. Where no objections are interposed to questions propounded to a witness and his testimony is admitted without objection, the party so failing to object is not entitled as a matter of

right to have the responsive testimony of the witness stricken out on motion, even though it may be irrelevant or incompetent, and open to attack by proper grounds of objection.

9. A party cannot be permitted to lie by, and experiment upon the testimony by failing to interpose objections thereto at the proper time, and ascertain what might come of it, for benefit or disadvantage, and then, if it turns out to be unpropitious for him, seek to have it excluded altogether on motion.

10. Because a cross-examination shakes the credibility, or demonstrates the inaccuracy and unreliability of the testimony of a witness given by him on his direct examination, it furnishes no reason or ground for striking out such testimony on motion, but, if it is otherwise proper testimony, it remains for the proper consideration of the jury—both the testimony brought out on the direct examination as well as that elicited on the cross-examination.

11. Where the matter to be proved is simply the fact that a contract has been made, as distinct from its terms or provisions, the best evidence rule does not apply and parol evidence is admissible.

12. In an action of ejectment, where the defendant relies upon adverse possession for the requisite statutory period, no *error* is committed in sustaining an objection of the defendant to a question propounded by plaintiffs to a witness as to whether or not the custom had prevailed about 15 years or more ago of cutting timber on lands without first obtaining the permission of the owner thereof, since such custom would have been a direct violation of the law, and custom cannot prevail against a legal right.

13. A peremptory instruction to the jury to return a verdict in favor of the plaintiffs is properly refused where the evidence is conflicting and will admit of different reasonable inferences.

14. In an action of ejectment, where the defendant relies upon adverse possession of the lands in question for the requisite statutory period, and the evidence fails to establish the character of such possession for such period, under the terms of the statute, a judgment rendered upon a verdict in favor of the defendant must be reversed and the case remanded for a new trial.

This case was decided by the court En Banc.

Writ of Error to the Circuit Court for Santa Rosa County.

The facts in the case are stated in the opinion of the court.

*Jones & Pasco,* for Plaintiffs in Error;

*T. F. West,* for Defendant in Error:

SHACKLEFORD, J.—This is an action of ejectment instituted in the Circuit Court for Santa Rosa County by the plaintiffs in error against the defendant in error, seeking to recover the possession of that tract of land known as the "Christian Limbaugh Grant," being Section twenty-two, Township one North of Range twenty-nine West, containing about 700 acres, together with mesne profits. No point is made on the pleadings, the declaration being in the usual form, to which the defendant filed a plea of not guilty. Trial was had before a jury, resulting in a verdict and judgment in favor of the defendant, which the plaintiffs seek to have reviewed here by writ of error.

Seven errors are assigned, but the sixth is expressly abandoned. The first and seventh assignments are discussed together by the plaintiffs, and we shall likewise so treat them. The first assignment is based upon the overruling of the motion for a new trial, while the seventh is based upon the refusal of the trial court to instruct or direct the jury to return a verdict in favor of the plaintiffs. The motion for a new trial consists of five grounds, the first four of which question the sufficiency of the evidence and the fifth of which is that the court erred in admitting over the objection of the plaintiffs the deed from John Hobbs as trustee to Tom Robinson and John Hobbs, such fifth ground also constituting the basis for the third assignment.

As ˙ is admitted by the plaintiffs, two-thirds of the transcript is composed of documentary evidence of plaintiffs' title which is unnecessary for us to consider by reason of the fact that the court instructed the jury that the plaintiffs had sufficiently deraigned their title from the sovereign to one John Innerarity, their ancestor, under whom they claim as heirs and that if such heirship is established by a preponderance of the evidence the legal title would be in the plaintiffs. The plaintiffs below, who are the plaintiffs in error here, could not complain of this charge, even if it was erroneous, and as a matter of fact they are making no complaint on that point. No errors of any kind are predicated upon the charge of the court, and the only instruction requested and refused by the court was a peremptory instruction to return a verdict in their favor. We find that the jury was fully instructed upon the question of heirship, and as to the character and degree of proof requisite to establish the same. Since no exception was taken to that portion of the charge and no additional instructions requested by the plaintiffs, they must have conceived that the law applicable thereto was stated correctly. The defendant contends here that such heirship was not sufficiently established and discusses the testimony adduced along that line, but we see no occasion for going into this matter, especially since some of such testimony was admitted without objection. For the purposes of the case, as the matter comes before us, it may be assumed that such heirship was sufficiently established.

This brings us to the crucial question of the case, as to the sufficiency of the evidence to establish adverse possession by the defendant for the requisite statutory period. In other words, upon all the evidence adduced, could the jury as reasonable men have found a verdict for the defendant? In passing upon this question, we are not to be

guided by what we think the jury *ought* to have done or what we think we would have done had we been sitting as a jury, but whether as reasonable men they could have found such verdict.    This was the question first propounded to the trial judge in the motion for a new trial, which he overruled, thereby giving the verdict his sanction and tacitly answering such question in the affirmative. See the discussion in Thayer's Preliminary Treatise on Evidence, 208 *et seq.,* as to the revising or setting aside by the court of the verdict of a jury, which we have referred to with approval in Seaboard Air Line R. Co. v. Scarborough, 52 Fla. 425, text 449, 42 South. Rep. 706, text 714, and Atlantic Coast Line R. Co. v. Beazley, 54 Fla. 311, text 422, 45 South. Rep. 761, text 796.    We would also refer to the several opinions rendered   in Metropolitan Ry. Co. v. Wright, L. R. 11 App. Cas. 152, citations from which appear in note 1 on page 209 of Thayer's Preliminary Treatise on Evidence.    Also see note on page 69 of Vol. 15 of English Ruling Cases.    The jury is the duly constituted authority appointed to decide disputed questions of fact, and we think that this is a wise provision.    As was well said in Kelly v. Strouse, 116 Ga. 872, text 888, 43 S. E. Rep. 280, which language we quoted and approved in Atlantic Coast Line R. Co. v. Beazley, 54 Fla. 311, text 423, 45 South. Rep. 761, text 797:    "Juries make mistakes, but their mistakes are probably no more numerous or no more disastrous to parties and the public than the mistakes of judges who assume to decide issues of fact."    Professor Thayer, on page 208 of his cited work, in speaking of the province of the trial judge and of the jury, after stating that the duty of keeping the jury within the bounds of reason, "as well as that of preserving discipline and order, belongs to the judge in his mere capacity of presiding officer in the exercise of judicature," goes on to say:

"Reason is not so much a part of the law, as it is the element wherein it lives and works; those who have to administer the law can neither see, nor move, nor breathe without it.   Therefore, not merely must the jury's verdict be conformable to legal rules, but it must be defensible in point of sense; it must not be absurd or whimsical.   This, of course, is a different thing from imposing upon the jury the judge's own private standard of what is reasonable.   For example, when the original question for the jury is one of reasonable conduct, and a court is called on to revise the verdict, the judges do not undertake to set aside the verdict because their own opinion of the conduct in question differs from the jury's. They are not an appellate jury.   The question for the court is not whether the conduct ultimately in question, *e. g.,* that of a party in a railway accident, was reasonable, but whether the jury's conduct is reasonable in holding it to be so; and the test is whether a reasonable person could, upon the evidence, entertain the jury's opinion. Can the conduct which the jury are judging, reasonably be thought reasonable?"   Lord Halsbury said in Metropolitan Railway Co. v. Wright, *supra,* "If reasonable men *might* find (not 'ought to' as was said in Solomon v. Bitton, L. R. 8 Q. B. Div. 176) the verdict which has been found, I think no court has jurisdiction to disturb a decision of fact which the law has confided to juries, not to judges.*   *   *   I think the test of reasonableness, in considering the verdict of a jury, is right enough, in order to understand whether the jury have really done their duty.   If their finding is absolutely unreasonable, a court may consider that that shows that they have not really performed the judicial duty cast upon them; but the principle must be that the judgment upon the facts is to be the judgment of the jury and not the judgment of any other tribunal."

Now, it is primarily for the trial judge to pass upon
this question in ruling upon the motion for a new trial.
When he concurs in such finding and refuses to disturb
it, and there is evidence to support it, in the absence of
any showing before us that the jurors were improperly
influenced by considerations outside the evidence, we must
follow the example of the trial judge in refusing to dis-
turb it.     That has long been the settled practice of this
court.    See Atlantic Coast Line R. Co. v. Beazley, *supra;*
Simms v. Hodges, 34 Fla. 498, 16 South. Rep. 317;
Schultz v. Pacific Insurance Co., 14 Fla. 73, text 94;Mc-
Nish v. State, 47, Fla. 69, 36 South Rep. 176; Valdosta
Mercantile Co. v. White, 56 Fla. 704, 47 South. Rep. 961.
Numerous other decisions of this court will be found col-
lected in these cited authorities.    We would also call at-
tention to the language used by Chief Justice Anderson in
Carter v. Bennett, 4 Fla. 283, text 356, which was quot-
ed and approved in Bridier v. Yulee, 9 Fla. 481, text 485,
and in Walker v. Lee, 51 Fla. 360, text 369, 40 South.
Rep. 881, text 884, and referred to with approval in Pitt-
man v. State, 51 Fla. 94, text 123, 41 South. Rep. 385,
text 395, S. C. 8 L. R. A. (N. S.) 509. It may also be
well to bear in mind the primary object of a writ of error.
See State *ex rel.* Merchants National Bank v. Hull, Clerk,
37 Fla. 579, text 583, 20 South. Rep. 762. text 764; At-
lantic Coast Line R. Co. v. Benedict Pineapple Co., 52
Fla. 165, text 172, 42 South. Rep. 529, text 532: Hoopes
v. Crane, 56 Fla. 395, 47 South. Rep. 992, text 1001.

With these guiding principles before us, we turn to
the evidence adduced by the defendant to establish ad-
verse possession.    The first proof introduced by the de-
fendant was the following paper:

"I, John W. Butler, Collector of Revenues for such
county, do hereby certify that I did at public auction pur-
suant to notice given by law, as required on the 8th day

of December, A. D. 1869, sell the lands herein described for the sum of Thirty Dollars said sum being the amount due and unpaid for taxes, costs and charges on the described lands for the years A. D. 1866, A. D. 1867, A. D. 1868, and A. D. 1869. That said Robert Robinson or his assigns will therefore be entitled to deed of conveyance of said lands in accordance with law, unless the same shall be redeemed, with interest at the rate of fifty per cent. per annum, said lands are described as follows, to-wit:   Lying, being and situated in the county and state aforesaid, and known as the 'Christian Limbaugh' Grant being fractional section twenty-two (22) township one, north of range twenty-nine (29) west, containing five hundred and sixty six and 05-100 acres more or less.

Witness my hand and seal on this 3rd day of December, A. D. 1870.

(Signed)    John W. Butler    (Seal).

In presence of

D. H. Golson.

Joseph Stinson.

State of Florida

County of Santa Rosa.

Before the undersigned County Judge in and for said county, personally came John W. Butler, Sheriff of said county, and acknowledged that he executed the foregoing deed for the consideration, uses and purposes therein mentioned.

In Testimony Whereof I have hereunto set my hand and affixed my seal of office on this 10th day of May, A. D. 1871.                    Dixon H. Golson,

(Seal.)        County Judge Santa Rosa County, Fla.

Endorsed on back thereof:

Tax Deed.   J. W. Butler to R. Robinson.   Recorded

May 12th, 1871, in Book A. on pages 382.    J. A. Chaffin, Clerk Ct. Court.    No. 267.    Fee 75."

At the time of offering this paper the defendant stated that he offered it for the purpose of showing color of title, to the introduction of which the plaintiffs objected "unless it was connected in some way with the defendant or those under whom he claimed.    And the said paper was admitted subject to be stricken if the defendant, or those under whom he claimed, were not connected with the same."    No exception was taken to this ruling and no assignment is predicated thereon.    Even if there had been, such assignment could not avail, as the ruling of the court was entirely proper upon the grounds of objection urged, since the trial court is authorized to regulate the order of the introduction of evidence, and its discretion in this matter will be interfered with by an appellate court only when an abuse thereof is clearly made to appear.    Wilson v. Johnson, 51 Fla. 370, 41 South. Rep. 395; Stearns & Culver Lumber Co. v. Adams, 55 Fla. 394, 46 South. Rep. 156, and authorities there cited. "If evidence apparently incompetent only because its relevancy is not apparent, or because it is not the best evidence, is offered, the court may, in the exercise of its discretion, receive it conditionally, if counsel gives assurance that he will supply the necessary foundation afterward.    If, however, such evidence is so conditionally received, and the necessary connecting evidence is not introduced, so as to show the relevancy of the admitted evidence, the court should exclude the evidence so received on its own motion, but if the failure to connect be not apparent or glaring, the objecting party should move to exclude."    Pittman v. State, 51 Fla. 94, 41 South Rep. 385, S. C. 8 L. R. A. (N. S.) 509; Walker v. Lee, 51 Fla. 360, 40 South. Rep. 881; East Coast Lumber Co. v. Ellis-Young Co., 55 Fla. 256, 45 South. Rep. 826.    We

find that no such motion to strike out the instrument in question was ever made by the defendant, though, at the close of the defendant's evidence, the plaintiffs did move to "strike out all the evidence as to any agreement or ownership by the grantee in the tax deed to Robert Robinson, or by his executors, on the ground that claim and acts of possession thereunder had not been connected with the parties under whom the defendant claimed to hold the land," which motion was overruled by the court and plaintiffs have attempted to predicate the fourth assignment on such ruling. Such assignment is as follows: "The court erred in denying the motion of the plaintiffs to strike out the tax deed to Robert Robinson and all evidence as to any acts of possession of Rob Robinson or his executors." We may conveniently dispose of this assignment now. As we have already seen, the bill of exceptions does not show that any motion was ever made to strike out the "tax deed," if it may be so called, therefore this assignment is not borne out by the record. The assignment is also to broad for the additional reason that practically all of the evidence adduced by the defendant as to possession of the land was received without objection. "Where no objection is made at the trial to the admission of evidence, it is considered as received by consent and objections if any to the evidence are waived, and the appellate court will not ordinarily consider an assignment of error based on the admissibility under the rules of legal procedure of the evidence so admitted without objection." Sims v. State, 54 Fla. 100, 44 South. Rep. 737; Marshall v. State, 54 Fla. 66, 44 South. Rep. 742; Platt v. Rowand, 54 Fla. 237, 45 South. Rep. 32 As will also be seen by reference to these cases and the authorities cited therein, it is further settled law in this court that a motion to strike out the entire testimony of a witness, or witnesses, should be denied, if any part

thereof is admissible for any purpose. It is clear that this fourth assignment must fail. We will be in a position to determine, after we have finished our examination of all the evidence adduced by the defendant, whether the court should have stricken out the so-called "tax deed" of its own motion for the failure of the defendant to introduce the necessary connecting evidence.

The next documentary evidence offered by the plaintiffs was a certified copy of the last will and testament of Robert Robinson, deceased, by which all of his property was devised to Thomas Robinson, his son, and Geo. A. Creary, in trust for his son, Robert Robinson and other specified purposes, the trustees being given full power and authority to sell any and all such property, none of which is described in the will, and the trustees also being appointed executors thereof. Proof of the probate of such will and also a deed bearing date the 9th day of November, 1895, from Geo. A. Creary and Thomas Robinson to John Hobbs, in which the property in question was described was also offered in evidence. In the body of such deed the grantors style themselves "executors of the estate of Robert Robinson, decd.," but they executed and acknowledged the same as individuals. All of these instruments were admitted in evidence without objection. The defendant then offered in evidence the following deed from John Hobbs, Trustee, to Thomas Robinson and John Hobbs:

"State of Florida,

Santa Rosa County.

Know All Men By these Presents, That I, John Hobbs, as trustee for Thos. Robert and Harriet Robinson, and Pamilia Hobbs, (my wife) as heirs of Robert Robinson, deceased, for and in consideration of one dollar, the receipt whereof is hereby acknowledged, do bar-

gain, sell convey and grant unto Thomas Robinson and John Hobbs of said State and county, their heirs, executors, administrators and assigns, forever the following described property, to wit:   Lying and being situate in the county of Santa Rosa, State of Florida, to wit:   The C. Lambaugh Grant, being section 22 in Township One (1) North of Range 29 W. subject, however, to a certain lease executed by the said John Hobbs as Master to one E. G. Creighton, dated November 21st, 1896, and recorded in the Clerk's office on page 191 and 192 records of deeds, &c., of Santa Rosa County, Florida, in Book J.

. Together with all and singular the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining, free from all exemptions and rights of homestead.

And I covenant that I am well seized of the said property as trustee aforesaid and have a good right to convey the same; that it is free of encumbrance, and that I will as trustee the said grantees, their heirs, executors, administrators and assigns in the quiet and peaceable possession and enjoyment thereof, against all persons lawfully claiming the same, shall and will forever warrant and defend.

In Witness Whereof, I have hereunto set my hand and seal this 23 day of November A. D. 1896.

Signed, sealed and delivered        John Hobbs (Seal)
in presence of                                              Trustee.

L. P. Golson,
J. H. Collins.

State of Florida,
      County of Santa Rosa.

Before the subscriber personally appeared John Hobbs known to me to be the individual described, and acknowledged that he executed the foregoing instrument as trus-

tee as aforesaid and for the uses and purposes therein set forth.

Given under my hand and official seal, this 23rd day of Nov. A. D. 1896.

(Seal)                                L. P. Golson,
                                          Clerk Circuit Court.

Endorsed on back thereof:

State of Florida, Santa Rosa County.   John Hobbs, Trustee, to Robinson & Hobbs.   Warranty Deed.   Received this 23 day of November, A. D. 1896, at ———— o'clock — M., and recorded in Volume J., page 195, the 24th day of November, 1896.

(Seal)         L. P. Golson,
                   Clerk Circuit Court."

The plaintiffs objected thereto "on the ground that it was from John Hobbs as Trustee, while the chain of title offered in evidence by the defendant for the purpose of showing color of title was to John Hobbs individually, but the court overruled the said objection and allowed the deed to be admitted in evidence, to which ruling the plaintiffs excepted."   This ruling forms the fifth and last ground of the motion for a new trial as well as the basis for the third assignment of error.   We derive practically no light upon this point from the respective briefs and it is but slightly argued.   In view of the subsequent developments in the evidence, we do not feel called upon to make a thorough investigation or enter into any extended discussion of the question presented by this assignment.   If the deed executed by John Hobbs as Trustee to himself individually and Thomas Robinson conveyed no title, whether by reason of the fact that the title was vested in John Hobbs individually or because one as trustee cannot make a valid conveyance to himself, at least without an order of court, then such deed was a

nullity and the title still remained in John Hobbs. If valid and effectual at all as a conveyance, it makes no difference, so far as the litigation is concerned, whether Robinson took the entire estate or he and Hobbs took it together.   See generally 9 Amer. & Eng. Ency. of Law (2nd ed.) 109, note 1, citing Cameron v. Steves, 9 New Bruns. 141 and Sheppard's Touchstone, 82; 13 Cyc. 527; Green v. Cannady, 77 S. C. 193, text 202, 57 S.E. Rep. 832, text 835.   This fifth ground of the motion for a new trial and the third assignment must be regarded as not having been sustained.

Robinson & Hobbs seem never to have conveyed this property to anyone but to have regarded and treated it as being owned by them jointly.   We must now proceed to examine the testimony of the witnesses as to adverse possession of the land by the defendant and those under whom he claims.   The first witness introduced by the defendant was Thomas R. Robinson.   We shall give the material portions of his testimony.   After stating that he was a son of Robert Robinson (the grantee in the so-called "tax deed" and the maker of the will to which we have referred), he goes on to say:   "My father has been dead about twenty years; I have been acquainted with the Christian Limbaugh Grant for about thirty-seven or thirty-eight years.   My father exercised acts of ownership over it.   The acts exercised were keeping off trespassers, having a claim on it and working on it.   He had a building on it.   He cut some timber and hauled and sold it.   I think he acquired his title about 1872 or 1873.   I do not know when the house was built.   He built the house; he went up there to work and when I came the house was built.   I think he built it.   That has been about thirty-seven or thirty-eight years ago.   I don't recollect who cut the timber for him.   I was about twelve or thirteen years old at the time.   I don't remember the

length of time he cut timber there. Mr. George W. Hamilton assisted him in cutting the timber. There were others who assisted him but they are not here. I don't know any one that assisted him putting up this building. He just put one building on it himself. There was another building put on there by Mr. Charles Deen and Silas Jernigan, Sr. These were put on the bay on the shore. I think they used these buildings for a camp and fishing and one thing and another. I lived out there about forty-two years." On cross-examination, he testified, "I know where the north line of the Limbaugh Grant is. The house I spoke of as built by Silas Jernigan was a little house set up with poles. It was not out in the water. It is not there now; it is gone." After the introduction of certain documentary evidence, to which we have referred, the witness was further examined by the defendant and testified as follows: "Upon the making of this deed by Hobbs as trustee to myself and others I leased the land to different parties. I put one log camp on the land and worked around it. I think it was in '88 or '89. Mr. Hobbs was connected with me at the time. The way Mr. Hobbs and I used the land after getting the conveyance was by selling timber off it and leasing to different parties. We leased some for booms, tying up timber on the river; we leased it for two or three times. Maybe once or twice to the Ferry Pass Association and one time to Mr. Creighton, and then we leased it to Mr. Hardie for turpentine purposes. It was Mr. Edwin Creighton that we leased it to. I think he used it to tie his timber up to. Had a house to put his poles in. I don't remember how long Mr. Creighton used it. The house Mr. Deen put on the land was just above the eastern boundary line. Mr. Jernigan used it for keeping nets for fish, etc., in. Mr. Harlie commenced to use it in 1903. He used it for turpentine purposes. He

boxed all he could use but could not use all of it because some of it was swamp land. He used it for about two years. Mr. Brosnaham and Marquardt also used the land for shipping purposes. They stocked lumber on it and had a wharf and a lumber bed and a house on it. The wharf was on the water front and also the building that they erected on it. They also ran a tramway over it starting on the north side and going through to the south side. The tramway was there maybe two or three years, but I don't remember how long. We cut some timber off of it in 1900 and 1901, and also in '98 and '99. We sold different parties timber off of it. We sold Otis and Whitmire when they were in partnership at Mulat. I think this was in 1901, and then we sold some during 1906. Mr. K. J. Whitmire measured the timber that we sold. Mr. Whitmire measured the first and Mr. Chris was to measure the last. I made the trade and the lease with Mr. Otis. I think this was in August or September, 1906. I don't know how much we sold him in 1906, as we did not get a statement. I was at the office of his mill when I sold it. I cut shingles from this land in 1902. Mr. Hobbs and I used these shingles to cover our houses, but the houses were not located on these lands. There is a house and a little saw mill on it now. Mr. Jernigan operates it. This saw mill and house was placed there in 1905 and was washed away during the storm in 1906, and put back there after the storm. Mr. Jernigan got his authority to put the mill there from Mr. Hobbs and myself. At the time of the storm in 1906 there was a mill and about two other houses that I know of. The mill was in operation at the time of the storm and was put back there after the September storm. If my memory serves me right, it was in 1900 or 1901 that I got the shingles.

And on cross-examination the witness testified as

follows:    I did some logging there in '88 or '89, I think. I am not positive about the year, but I know we did some logging there about two years ago.    The leases that I testified about were in writing.

And thereupon the plaintiff moved the court to strike the testimony as to the leases on the ground that they were in writing and were the best evidence.    But the court overruled said motion, to which said ruling the plaintiff excepted.

I did not see Mr. Creighton use these lands at all. All I know is he leased it to use it.    Mr. Creighton had a house on it; all I know is that there was a house on it, and he said he put it there.    The logs that we sold to Otis and Whitmire was cut and put on the banks of the bay and sold to them there."

The plaintiffs make the denial of their motion to strike out the testimony of the witness as to the leases to Hardee, Creighton and Thornton the basis for the second assignment of error.    This assignment has not been sustained.    All of such testimony appears to have been admitted without objection.    As we held in Platt v. Rowand, 54 Fla. 237, 45 South. Rep. 32, "Where no objections are interposed to questions propounded to a witness and his testimony is admitted without objection, the party so failing to object is not entitled as a mater of right to have the responsive testimony of the witness stricken out on motion, even though it may be irrevelant or incompetent, and open to attack by proper grounds of objection.    When evidence which may have been irrelevant, or otherwise open to an objection seasonably made, has been admitted without objection, the witness having been examined and cross-examined by the respective parties, it is not error to deny a motion to strike out such evidence made after its tendency and effect have been disclosed.    A party cannot be permitted to lie by, and

experiment upon the testimony by failing to interpose objections thereto at the proper time, and ascertain what might come of it, for benefit or disadvantage, and then, if it turns out to be unpropitious for him, seek to have it excluded altogether on motion.    Because a cross-examination shakes the credibility, or demonstrates the inaccuracy and unreliability of a witness given by him on his direct examination, it furnishes no reason or ground for striking out such testimony on motion, but if it is otherwise proper testimony, it remains for the proper consideration of the jury—both the testimony brought out on the direct examination as well as that elicited on the cross-examination."    Also see authorities there cited: Lewis v. State, 55 Fla. 54, 45 South. Rep. 998; Thompson v. State, 55 Fla. 189, 46 South. Rep. 842.    We would also call atention to the principle that "where the matter to be proved is simply the fact that a contract has been made, as distinct from its terms or provisions, the best evidence rule does not apply and parol evidence is admissible." 17 Cyc. 477, and authorities there cited, and 1 Elliott's Evidence, Section 216, and authorities cited there.    Also see Cross v. Aby, 55 Fla. 311, text 320, 45 South. Rep. 820, text 823.

B. D. Whitmire testified that he was Tax Collector of Santa Rosa County and that the tax books in his office showed that the tract of land in question was assessed from 1872 to 1886 inclusive to Robert Robinson, for 1887 to the Robinson estate, from 1889 to 1894 inclusive to Robinson and Creary, for 1895 and 1896 to John Hobbs, and from 1897 to 1907 to Hobbs and Robinson, and that the books show taxes to have been paid by the parties to whom the land was assessed each year.

Robert Robinson, after testifying that he was the son of Robert Robinson, proceeded further to testify as follows:    "I have been acquainted with the location of the

Christian Limbaugh Grant about fifteen years, but with the land about twenty-five years, I suppose. I don't know exactly how long it was when I was first on the land, but I suppose it was twenty-five years. I have been on there with my father and also my brother; I was there with my father at different times hunting and to see if parties were trespassing. On one occasion I went there with my father and there was an old gentleman cutting shingles. My father stopped it. My father claimed the land first about twenty-five years ago. That is my first knowledge of it. I don't recollect that my father used it in cutting timber and shingles or anything in my time." On cross-examination, he testified: "I have lived at Mulat three years and a little over. When I came there this last time it had been about twenty-five years since I had lived there before. During those twenty-five years I lived at Bay Point and in South Florida."

The other testimony adduced by the defendant we think it well to copy in full. It is as follows:

"My name is George W. Hamilton. I knew old man man Robert Robinson in his life-time. I am acquainted with the Christian Limbaugh Grant in this county. I did some work for Mrs. Robinson and some for Mr. Robinson. It has been thirty-eight years ago since I worked for Mr. Robinson. The work I did was driving a team hauling logs. That was on this Grant. I hauled these logs for Mr. Robinson and he claimed at that time to own this Grant. I worked there about four months. There was a man by the name of Wilson and a man by the name of John McGee who worked for Mr. Robinson at the same time. We put logs in the bay at a place called Bass' hole at the time I referred to. We carried them on a cart to a ditch that Robinson had dug. We hauled them to the car and run them down and rolled them into the ditch

and then carried them by water.  A man took hold of the car and pushed it; the ditch was on the grant.  There was a building on the grant.  It was a camp about fifteen feet by twenty feet.  I suppose it to be about that but it has been so long I don't remember.  We slept in this camp at night and worked there logging this grant for about four months.  I have lived in that neighborhood ever since that time, about six miles from this grant. I know all the people who live in that territory.  This grant has been generally reputed to be by Pat Robinson, that is old man Robinson, ever since I can remember, and it has never been disputed as I know of.  In recent years it has been known as the property of Hobbs and Robinson.

On cross-examination the witness testified as follows:  This camp that I have referred to was a logging camp.  The contrivance that I have described was made for the purpose of moving the logs into the water; you rig up a car and put the logs on it and roll it down to the water edge and then roll the logs off into the water.

And the defendant further to maintain the issues on his part, introduced as a witness Sila Jernigan, who being duly sworn, testified as follows:  I knew Robert Robinson in his life-time.  He has been dead about fourteen years or fifteen years.  I have been acquainted with the location of the Christian Limbaugh Grant since 1868. I bought stumpage off this grant from Hobbs and Robinson about six or eight years ago.  About fifteen years ago I built a house on it; I got permission from old man Robinson.  This house is eighteen by twenty.  I used it for fishing; I was in the fish business.  The house stayed there some eight or ten years.  The house was made of planks.  I got permission from Pat Robinson or Robert Robinson in his life-time.  It stayed there until about four years ago.  All of this grant has been

turpentined except part of the swamp. It was boxed. four years ago to the best of my knowledge. Hardie worked it first then sold out to Thornton. There has also been a tram road run through it from Brosnaham & Marquardt's mill with a wharf and buildings. This was put there about three or four years ago. I don't remember exactly the time. They had a wharf and a house about twenty-four feet long with two partitions in it. There are improvements on the land now. A mill and dwelling house. They were put there something over two years ago. The mill was put there about eight months before the storm of September, 1906, and rebuilt after the storm. I don't know of any buildings on it now except the mill and the dwelling house. The house that I built on it was about three or four hundred yards from where the mill is now. My sons cut timber on it about the time of the storm. I have lived in that community sixty-two or sixty-three years. This land has been generally known as Robinson's land. Until the last year or so I have never heard any question of his ownership.

On cross-examination the witness testified as follows: I don't know where Jacoby's creek is. An island west of the Limbaugh Grant is the west boundary. This tract and another tract joins on the west line. The boundary on the west is the Innerarity tract, I believe. The John Simpson Grant and a piece owned by the Ferry Pass Association bounds this tract on the west. The fish camp that I ereeted was built east of the mouth of Simpson's river. The tide did not rise on this house until the time of the storm that I know of. The house was a fish camp fourteen by twenty feet.

And the defendant further to maintain the issues on his part introduced as a witness E. G. Creighton, who being first duly sworn, testified as follows: I live in Es--

cambia county, Florida. I am acquainted with the location of the Christian Limbaugh Grant. It was first pointed out to me in 1873 or 1874 by old man Robert Robinson. He claimed to own it. I leased it about ten years ago for boom, loading timber about the banks of the river. I leased it from Mr. Hobbs and Mr. Tom Robinson. That was about ten years ago, and used it for a boom for timber. Then about six years ago I leased it again. The first time I leased it for a year and the second time I think I leased it for a year. The first time I built a house on it. The time I built the house on it was about 1901 or 1902. That house was washed away by the storm; it was near the mouth of the Simpson river, right on the bank.

And the defendant further to maintain the issues on his part introduced as a witness J. M. Bowers, who having been duly sworn testified as follows: I know the location of the Christian Limbaugh Grant. I know Mr. Simeon Otis and Mr. Charles Jernigan. I built a house at the mouth of Simpson's river for Mr. Creighton. I don't know how long ago it was that I built it. Must have been about seven or eight years or maybe longer, but I don't remember. The house was built on the North side of the mouth of Simpson's river. The house was used by Mr. Creighton. Charles Deen and myself built it. The house was built of oar-poles and such trash as we picked up on the beach. Mr. Creighton kept his tools in the house. Very little timber was ever tied on that bank. The timber was tied above that bank and he had a very few rafts there. This was before the building of the house. There was very little timber cut there at that time. All I know about this land is that Mr. Robinson has claimed it for about twenty-eight years. I live at Bagdad. It has been known as the land of Mr. Robinson.

And the defendant further to maintain the issues on his behalf introduced as a witness K. J. Whitmire, who being duly sworn testified as follows: My name is K. J. Whitmire. I was a member of the firm of Otis & Whitmire. I looked after the logging business for the firm, the firm being engaged in the saw mill business. I masured most of the logs. I measured some logs for Hobbs and Robinson in 1901 or 1902, I think. I measured them at Bass' hole. They were right at the landing. They claim that Bass' hole is on the Limbaugh Grant. I measured these logs in the fall of 1900 and the spring of 1901, I think. I measured them for Hobbs and Robinson; these logs were hauled with boom. When the logs were measured by me they were on the land at Bass' hole. These logs were carried to Mulat and used by the firm of Otis & Whitmire.

On cross-examination the witness testified as follows: At the time I measured the logs they were cut and lying on the bank of the bay or river at Bass' hole.

And the defendant further to maintain the issues on his part introduced as a witness C. T. Robinson, who having been duly sworn, testified as follows: My name is T. R. Robinson. Some of the logs that Mr. Whitmire first testified about came off the Limbaugh Grant. Bass' hole is on the Christian Limbaugh Grant. They were put in a ditch and run down the ditch to the bay. My father, Robert Robinson put a part of that ditch there and Mr. Hobbs and I put the balance. Mr. Whitmire and Mr. Otis worked some on it because they had put the logs on the land and they done some work on the ditch to make it more convenient to pulling logs down. These logs were cut from the swamp.

And the defendant further to maintain the issues on his part introduced as a witness Washington Crane, who having been duly sworn, testified as follows: I cut some

shingles on Escambia Bay for Messrs. Hobbs & Robinson. I cut fifteen thousand for John Hobbs and sixteen thousand for Tom Robinson. I cut them about half way between Bass' hole and Woodbine. This was about seven or eight years ago. They were hauled off the land to their building. Hobbs and Charles Guernesy carried some of the shingles away. Woodbine is about three quarters of a mile from Bass' hole and about half way between them I cut the shingles.

And the defendant further to maintain the issues on his part introduced as a witness L. L. Whitmire, who being duly sworn, testified as follows: My name is L. L. Whitmire. I knew Mr. Robert Robinson, the old man, in his life-time. I know where the Christian Limbaugh Grant is. I bought stumpage from Hobbs and Robinson since the old man's death. I don't recollect exactly when I logged it; I logged it on two different occasions, the first time about 1890 or 1892, '93 or '95, maybe, I don't remember the date. I contracted with Hobbs for the stumpage. I put some of the logs in the ditch at Bass' hole and some above the railroad, about a quarter of a mile. This ditch was made by old man LeGarden and myself; cut logs and ditched the logs and run the logs. Old man Robert Robinson claimed the property; that is, I suppose he claimed it as he built a log camp and hauled logs off it a long time. He stayed in his camp himself several years. This must have been about thirty-five years ago. The camp was near the northeast corner. There were four people in the camp, two drivers and two fellows running the logs at a little tram road out about the bayou. The little railroad was laid on scantlings and carried logs out to the bayou and dumped them on the bayou. This was on the grant. I don't know how long that railroad stayed there; I suppose some of the ties are there yet. The camp building

was there for perhaps two years. That is, it was operated for about two years. I don't know how long it stayed but it was built of logs and I suppose remained standing about eight or ten years. Then there was a new camp building there but I don't know who built it. Hobbs occupied it. It was built a long way from the old camp. I think it was built after the old camp was gone. The old camp was probably torn down and used in building the new one, but I don't know about that. The camp that Mr. Hobbs occupied remained twelve or fifteen years. I don't know how long. It was used for hauling logs. They camped there and hauled logs off the track. I could not say how long that camp stayed there, but there was some of it left a couple of years ago. It stayed until they dug a road. I suppose it stayed since eight years. I don't know how long Hobbs occupied it. When he occupied it he was cutting logs off this tract. I also cut logs off this land; there was about three or four years difference in my cutting. I cut there after Hobbs did. The last cutting I did I suppose, was about eight or ten years ago.

On cross-examination the witness testified as follows: A log camp is built by notching poles and covering them. There wasn't any lumber to build them of. It is simply a camp for carrying on logging operations.

And the defendant further to maintain the issues on his part recalled as a witness El. G. Creighton, who being first duly sworn, testified as follows: I recall old man Robert Robinson claiming the Limbaugh tract as far back as 1872 and 1873. I remember distinctly that I used to carry him across the bay. He lived on the Santa Rosa side and I lived on the Escambia side and I would go across and carry him over. He worked with my uncle. There was a large pine on that land and he told me that was his tree and that he would not sell it

for $100.00. He told me whenever he sold it he ex-
pected to get $500.00 for it. He pointed out the grant
to me.

And the defendant further to maintain the issues on
his part called as a witness L. Thornton, who being duly
sworn, testified as follows: I am in the turpentine bus-
iness. I boxed the pine timber on the Limbaugh Grant
in 1903 and 1904; I got the lease from Hardie; he had
it leased. I bought out Mr. Hardie. I used it in the
usual way for turpentine purposes for three years. I
have now finished the use of it. Mr. Brosnaham and
Mr. Marquardt had a tram road on this land running
across it. There was some lumber beds and a house on
the water side used by Brosnaham & Marquardt. This
road was there when I went there and was used some-
thing like two years afterwards. There was a saw mill
erected there in June, 1907, by Charles Jernigan. I
don't believe there is any other improvements except the
saw mill of Mr. Jernigan. I don't recollect when the
mill was put there but it was there the storm washed it
away. It was put there some time in the spring or sum-
mer of 1906, I believe. The mill on this land was being
operated by Mr. Jernigan in June of year 1907, and there
were some houses on the land.

Charles Jernigan, the defendant, being called as a
witness in his own behalf, being first sworn, testified as
follows: My name is Charles Jernigan. I am the de-
fendant in this case. I have known the Limbaugh
Grant always. I have operated a saw mill business for
about three years I think. I am now running a saw mill.
Before the storm I had, I think, five houses and the saw
mill, and now I have one house and the saw mill on this
grant. The storm I have referred to is the September
storm of 1906. The saw mill was washed away and most
of my machinery by the storm. I put it back immediately

after the storm.  I got authority from Mr. Robinson and Mr. Hobbs to build on this grant. After the storm I was going up on a boat from Pensacola with Mr. Otis, Mr. Hardie and my brother, and Mr. Otis asked me what the storm did for me.  I said that it washed away about everything I had,  He said what are you going to do about it and I said going to build again.  He asked if I had started it and I said yes.  I did not use his authority.  It is not true that I asked his permission to put the saw mill back there and that he said yes, go ahead and make a living; I did not ask his permission at any time to put the mill back.  The conversation that I refer to was on the launch of a fellow named Harvell. I also had a conversation with him at Mulat; he asked me what the storm did for me and I said there was some of my lumber washed away.  I did not get his permission to reconstruct my mill.  I never got any authority except from Mr. Robinson and Mr. Hobbs.  I cut timber on this land—juniper and pine.  I got the authority from Mr. Robinson and Mr. Hobbs.  I never at any time asked authority from Mr. Otis.

Upon cross-examination the witness testified as follows: I cut the timber at different times. I cut some juniper about six or eight years ago and I cut some poles off there for Mr. Robinson.  Telegraph poles.  Since then I cut pine.  In 1906 I cut some pine.  I know Mr. Sudmall.  He applied to me for the right or permission to cut some poles off this land.  I told him that I could not cut any as the thing was in litigation.  He said I can get Mr. Otis and get the poles and I said you might get them from him but you can't get them from me.  I didn't tell him it was Mr. Otis' land.  I told him that I could not cut them myself nor anybody else.  This was only about three months ago, since this suit was brought. He never applied to me before that for permission to cut

any poles off this land. I tried to sell him some before that but it was up the river in booms. It was not from this land. I have some on hand now. From time to time he would tell me that he wanted poles but he never applied to me to get poles off this land except on the occasion that I have mentioned. I never paid Mr. Otis any stumpage for cutting poles off this land or promised to pay him.

And the defendant further to maintain the issues on his part, recalled T. R. Robinson, who testified as follows: I heard the statement of Mr. Otis as to cutting timber off this land in 1906. There was an agreement between him and me by which he was to pay $1.50 for the logs cut. Mr. Otis was in the saw mill business. His place of business is about three and a-half or four miles from the land."

In addition to documentary evidence introduced by the plaintiffs, both in chief and rebuttal, none of which we deem it advisable to set forth, several witnesses were placed by them on the stand. Among them was Simeon Otis, whose testimony was as follows: "My name is Simeon Otis. I live at Mulat, Santa Rosa county, Florida. I am familiar with the Christian Limbaugh Grant. It is also known as Turkey Island. I have lived in Mulat twelve years and in the county forty-two years. I am the Simeon Otis who is plaintiff in this suit. I have known Charles Jernigan from his boyhood up. I took possession of the Christian Limbaugh Grant in August, 1896. I worked it and logged it. Charles Jernigan made application to me after the storm in September, 1906, for permission to rebuild his saw mill which had been destroyed. I gave him the        to put it back and told him to go ahead and make his living, or something to that effect.

On cross-examination the witness deposed and testi-

fied as follows: ' I don't know exactly when I commenced logging it. I got the deed the 6th day of August, 1906, and it was after that I commenced to log it. I logged it five or six months.

And thereupon the defendant propounded the following questions: Q. Did you ever have any conversation with Mr. Robinson about logging this land? And the plaintiff objected to said question on the ground that said Mr. Robinson was not a party to the suit and any conversation with him would be immaterial to the issues. But the court overruled the said objection to which said ruling the defendant excepted. And thereupon the witness answered as follows: A. Yes sir, I had some conversation—he came to see me about logging it. He said he had leased it. I told him it was leased to Mr. Thornton for turpentine privileges. I did not state to Mr. Robinson that I wanted to buy this tract from him nor did I tell him what I would like to buy the timber standing on this grant. Afterwards he asked me about the profits and I told him that I would get it out of the timber. That it would reimburse me. Mr. Jernigan had a mill on this tract before the storm. I do not know which one of the Jernigans it was. There are so many of them. The Jernigan family was operating a mill on it at the time I bought it. I knew the mill was there. Charles Jernigan came to me shortly after the storm and wanted to know about putting his mill back and I told him to go ahead and put it back. He asked my permission to put it back and said the land was mine and I told him to go ahead and put the mill back and make a living. That was about all that was said. I know where this grant is located. It is on the south side of the bay. There are two or three of her tracts on the south side of the bay. The Keller Grant, Florida Town and the Simpson Grant, I call these on the south side of the bay. I don't know

whether there is any other grant of the other side of the bay from this one or not.   I am not familiar with them."

This witness, Simeon Ottis, was also called in rebuttal and testified as follows: "I have already been sworn.   Bass' hole is about midway on the Christian Limbaugh Grant.   The John Innerarity grant is Florida Town.   The grant between Florida Town and Bass' hole is a part of the Christian Limbaugh Grant.   Mr. Jernigan bargained with me for some poles for the Pensacola Terminal Company.   He promised to pay 25 cents for small poles and for the others agreed to pay the stumpage.   That was little time before the storm.   It was after I had gotten my deed for this land.   This talk between us took place sometime before the storm, but I don't know exactly how long.   I haven't collected the stumpage.   I got part pay for a ditch but I haven't collected it all."

The plaintiffs also introduced in rebuttal Wash Gilmore, who testified as follows: "My name is Wash Gilmore.   I live at Mulat.   I have lived in Santa Rosa county since I was a small boy.   I have been following the logging business forty years or more.   Followed it all that time in this county.

And thereupon the plaintiff propounded the following question:   Q.   Now the business of logging, that is in cutting timber Mr. Gilmore, was it about 15 years or more ago, customary to obtain the permission of the owner of the land before cutting the timber?   But the defendant objected on the ground that the evidence called for was immaterial and irrelevant.   And the court sustained the said objection, to which said ruling the plaintiff excepted, and thereupon plaintiff propounded the following question:   Q.   Now Mr. Gilmore, in carrying on logging operations on any tract of land is it usual to erect a camp of any kind?   To which question

the defendant objected on the ground that it was immaterial and irrelevant to the issues in said case. And the court sustained the objection, to which said ruling the plaintiff excepted."

C. E. Sudenball was also introduced by the plaintiffs in rebuttal and testified as follows: "My name is C. E. Sudenball. I am manager of the Telephone Exchange. I know Mr. Charles Jernigan. Before the storm in 1906 I made application to him to purchase some poles. The land from which I wanted to purchase the poles was located between the Florida Town and Bass' hole on the Escambia Bay. Mr. Jernigan told me that he would have to pay stumpage to Mr. Otis for the poles if cut off the land; he would have to figure his price on the basis of 25 cent stumpage to Mr. Otis. He said he would get them at cost and would not charge me any more than it would cost to have his man cut them. He did not want to make any profit.

On cross-examination the witness testified as follows: He said he didn't want to make any profit and that he would get them out at cost. I don't remember what they were to cost. He said how many there were but I don't recollect it now. We had this conversation at Bass' hole; we talked about it on several occasions. I knew where he was going to get these poles. He said he could get some for me at the same place he was getting poles for the company in Pensacola and he supposed they would be too small for them and he got larger ones for them. He was cutting poles at that time. Not long ago he said he had some poles by the river that he would let me have. At the time he was talking to me he was close to his mill at Bass' hole."

The fifth assignment is based on sustaining the objection of the defendant to the following question propounded by the plaintiffs to the witness Wash Gilmore:

"Now the business of logging, that is cutting timber, Mr. Gilmore, was it about 15 years or more ago customary to obtain the permission of the owner of the land before cutting the timber?

No error is made to appear here.    Even if we assume that the witness would have testified in response to the question that the custom did prevail at the time in question of cutting timber from lands without obtaining permission from the owner it could not have availed, since such custom would have been a direct violation of the law, and custom cannot prevail against a legal right. See Sullivan v. Jernigan, 21 Fla. 264; Abbott's Trial Brief, Mode of Proving Facts (2nd ed.) 595, and authorities cited in notes; 29 Amer. & Eng. Ency. of Law (2nd ed.) 376, and numerous authorities there cited.

.The. sixth assignment based upon the sustaining of an objection to another question propounded to this same witness is expressly abandoned.

The seventh assignment is based upon the refusal of the trial court to direct or instruct the jury to return a verdict in favor of the plaintiffs.  This request was properly refused.    See German-American Lumber Co. v. Brock, 55 Fla. 577, 46 South. Rep. 740, and authorities there cited; Starks v. Sawyer, 56 Fla. 596, 47 South. Rep. 513; McKinnon v. Johnson, decided here at the present term.

This disposes of every question presented to us, except the crucial one whether or not the evidence adduced was sufficient to warrant the jury in returning a verdict for the defendant.    After a most careful consideration of all the evidence, we are constrained to answer this question in the negative, bearing well in mind the guiding principles with which we started out.    We have set out all the evidence which throws or tends to throw any light upon this vexed question of the acquisition of title

by adverse possession.  We have frequently had occasion to refer to and construe our statute in regard thereto, which is now Section 1721 of the General Statutes of 1906, so it is unnecessary for us to go into any extended discussion of the matter.  See the recent cases of Hyer v. Griffin, 55 Fla. 560, 46 South. Rep. 635, and Avery v. Lock, 55 Fla. 612, 46 South. Rep. 844, and authorities found cited therein.  We would refer especially to the well reasoned case of Gould v. Carr, 33 Fla. 523, 15 South. Rep. 259, S. C. 24 L. R. A. 130.  Considering the acreage of the tract of land in question, the character of it, the kind of possession the testimony discloses that the defendant and those under whom he claims had and exercised, we are clear that, under the legal principles enunciated in the cited cases, adverse possession for the requisite statutory period has not been established.

Although the point is not made before us, we would call attention to the so-called "tax deed," but which in reality is only a tax certificate, offered as color of title. As to what constitutes color of title, see Sec. 1721 Gen. Stats. and authorities collated in 2 Words & Phrases, 1264 to 1273; 1 Cyc. 1099.

The evidence is not sufficient to support the verdict, and the court erred in denying the motion for a new trial. It follows that the judgment must be reversed and the case remanded for a new trial.

All concur, except PARKHILL, J., absent on account of illness.