J. WHITING HYER, *Plaintiff in Error,* v. MARY A. GRIFFIN AND ETHAN A. GRIFFIN, HER HUSBAND, *Defendants in Error.*

1. An assignment of error to the effect that the trial court erred in denying the motion for a new trial is not too general to merit consideration by an appellate court, but the plaintiff in error will be confined to the grounds specifically stated in such motion, and an appellate court will refuse to consider any grounds thereof except such as are argued before it, treating the other grounds as abandoned.

2. In an action of ejectment, where the defendant relies upon adverse possession under the statute, in the nature of things, every case must stand largely upon its own merits, depending entirely upon the testimony.

3. In an action of ejectment, where the defendant claims under color of title and the land in dispute has not been enclosed, the taking of dead timber therefrom at the rate of about two one-horse wagons loads a week, even though during the entire statutory period of seven years, for use as fuel at another place or for sale, no trees being felled for that purpose, and the occasional cutting of fence posts from the land, together do not constitute such adverse possession as to bar an action by the owner.

4. The possession necessary to confer title under an adverse holding must be actual, continuous and adverse to the legal title for the full statutory period, and such possession must be established by clear and positive proof.

This case was decided by Division A.

Writ of Error to the Circuit Court for Escambia County.

The facts in the case are stated in the opinion of the court.

*Blount & Blount & Carter,* for plaintiff in error;

*Sullivan & Sullivan,* for defendants in error.

SHACKLEFORD, C. J.—The plaintiff in error brought an action of ejectment against the defendants in error in the circuit court for Escambia county, which resulted in a verdict and judgment for the defendants, which the plaintiff seeks to have reviewed here upon writ of error.

No error is assigned in connection with the pleadings; the declaration being in the usual form, to which the defendants interposed a plea of not guilty. The

36

sole assignment presented to us for consideration is the denial of the motion for a new trial. The defendants contend that this assignment is too general to merit consideration and, in support thereof, rely upon Stearns & Culver Lumber Co. v. Adams, 55 Fla. 401, 45 South. Rep. 847. The cited case does not bear out this contention. What we held there was that "an assignment of error that 'the court erred in rendering judgment for the plaintiff in said cause' is too general to be considered by this court." In fact, the contention of the defendants has been decided adversely to them by this court in a line of decisions. We have frequently considered an assignment of error to the effect that the court erred in denying the motion for a new trial, but we have refused to consider any grounds thereof except such as are urged before us, which grounds must be specifically stated in the motion, treating the other grounds as abandoned. See Ross Johnson v. State, decided here at the present term, and authorities there cited; Goode v. State, 50 Fla. 45, text 54, 39 South. Rep. 461, text 464; Williams v. State, 53 Fla. 89, 43 South. Rep. 428; Atlantic Coast Line R. Co. v. Beazley, 54 Fla. 311, 45 South. Rep. 761, text 796; Cross v. Aby, 55 Fla. 311, 45 South. Rep. 820, text 825; McCall v. State, decided here at the present term.

Such motion in the instant case contains five grounds, all of which, however, question the sufficiency of the evidence to sustain the verdict, and we now take up that point for consideration.

We find that the plaintiff introduced in evidence a complete chain of title from the government down to himself, while the defendants introduced a tax deed and subsequent conveyances based thereon, showing a *prima facie* title in one of them, Mary A. Griffin. By the introduction, however, by the plaintiff, of a certified copy of the assessment roll for the year for which the land

in dispute was sold for taxes, such assessment was shown to be invalid, and in the general charge to the jury the court so instructed, stating that the tax deed conveyed no title. This left the defense resting upon adverse possession, based upon the deed to Mary A. Griffin as color of title. The land in dispute consisted of a forty-acre and a ten-acre tract. The date of the deed to the defendant is the 27th day of October, 1899.

Ethan A. Griffin testified on behalf of the defendants as follows: "I am a defendant, the husband of Mary A. Griffin. At the time I received the deed made to my wife by Carlson and Lind dated October 27th, 1899, we were living in Pensacola. Soon after receiving the deed, I began to cut fire wood from the land in dispute and continued to cut it pretty regularly. I paid taxes on the land from the time I bought it, up to the present time;" witness here produced and the defendant read in evidence tax receipts from the tax collector of Escambia county showing payment of state and county taxes, upon the land in dispute and other lands, as follows: By Mary A. Griffin for 1899, by E. A. Griffin for 1900, 1901, 1902, 1903, 1904. The witness continued: "I used part of the firewood at my home in Pensacola while I lived there, and part at my home about half a mile from this land, after I moved from Pensacola. The rest I sold in Pensacola. I would get about two loads a week. I began to get wood the next month after I bought the land and continued this up until now. I let Flem Brooks burn some charcoal on the land after the storm 1906. I had Flem Brooks' boys cut wood for me on this land. I got some posts to put up a wire fence around that part of the land which had formerly been under fence of Travis Waters; also some posts to repair the fence on some other lands, that I was living on when I moved out in that neighborhood. I do not know how many posts I cut off the land last mentioned, not

very many, but a few at different times. When I first
bought the land part of Mr. Travis Waters' fence ran
over on it enclosing about two acres. I had an arrange-
ment with him that he could use these two acres. He
cultivated it under this arrangement. When I first got
my deed I asked Dime Lock, who lived on the quarter
section west of this land, to look out for it and keep
trespassers off for me. I moved from Pensacola to
within about half a mile of this land, I think about the
year after I got my deed. Before I moved there, the
wood I got was burned at my home in Pensacola, or
sold by the load in that city. The same thing occurred
after I moved. The wood which I got was either used
at my home or sold in Pensacola. The wire fence around
the little piece of land that used to be enclosed by Mr.
Waters' fence, was a two-wire fence, built about a year
ago, in the late fall or winter of 1906. I never cut down
a tree on any of the land, I simply used the dead wood for
fuel and posts. The storm of 1906 was about September
26th, 1906. I did not rent the enclosed land to Travis
Waters, I simply let him cultivate it, as his fence was
upon it. We had no particular understanding or agree-
ment about it at all, I simply did not forbid his using
it. I got an average of about two loads of wood a week
from this land ever since I bought it, every year. By
load I mean a one horse wagon load. I got wood most
all over the lower forty, but the ten-acre piece I cannot
say I cut so regularly from that. I may have gotten as
many as a dozen loads all told, from the ten-acre piece.
I cannot say I ever got more than that off the ten-acre
piece. I got wood wherever convenient on the fifty acres.
I never made any improvement on any of the land.
Never cut or sold logs from it. Never enclosed, rented,
improved or cultivated any part of it, except I built the
small wire fence already mentioned. I never got any
wood or posts except from timber that was down. Never

cut a standing tree. I generally got the wood near the road where it was convenient. Dime Lock never made any reports to me after I asked him to look out for the lands. I can not say how many posts I cut off the land to use on the place I was living at. I know I cut some occasionally to repair fences where I lived. We owned 200 acres in that neighborhood, all conveyed by the deed of Carlton & Lind."

Dime Lock testified on behalf of the defendants as follows: "Mr. Griffin asked me to look out for the land in dispute, for me to keep trespassers off it. I do not know how long ago this was, but it has been a good while. I never did anything about it, as there was nothing to do. I saw nobody trespassing upon the land, nor did I make any reports to Mr. Griffin." And the defendants further to maintain the issues on their behalf produced as a witness Flem Brooks, who, being sworn, testified as follows: "I burnt charcoal on the land in dispute. I got permission from Mr. Griffin to do so. My boy also cut wood on the land for Mr. Griffin. Charcoal was burnt after the storm of 1906 from timber that was blown down by the storm. I do not know what part of the land the charcoal was burned on, nor where the wood was cut. Do not remember when the wood was cut. It was a good while ago."

In rebuttal, Travis Waters, A. J. Mackey, the plaintiff, and Plowden Richardson testified as follows on behalf of the plaintiff:

Travis Waters: "I live right at the land in controversy. From my house I can see almost over all the land in dispute. I have lived there since prior to 1899. My fence once enclosed a small part about two acres of this land, but long before Mr. Griffin moved out there, the fence had rotted down. The land was not cultivated. I never cultivated this piece after Griffin claims to have bought the land, nor did I ever pay or agree to pay him

any rent for it.    He said nothing to me about using the land and I had no arrangement with him about it whatever.    I never saw Mr. Griffin cutting wood off the land in dispute, though I lived right at it.    For several years past the public road has run through this land, the road before the new public road was built, ran right by my house, this road came to Pensacola.    I have seen Mr. Griffin go by my house a few times with a small load of wood, but not very often, and I never saw him cut any wood off the land, never saw him on the land cutting wood."

A. J. Mackey: "I know the land in dispute.    The little piece that was enclosed by Travis Waters' fence has not been cultivated for years.    The fence was rotted down and the piece not cultivated long before Mr. Griffin moved out there from Pensacola.    The new fence built around that piece by Griffin was built after June, 1906. I know that to be a fact.    There was no fence there in June, 1906, for I went over the land about that time. I saw no signs of wood cutting on the land when I went over it.    I am, a partner in business with J. Whiting Hyer, plaintiff.    I made a warranty deed for this land to Chas. Krueger.    I presume it was a warranty deed, as the certified copy offered in evidence purports to be such."

J. Whiting Hyer: "Just before buying this land I went over it, it must have been in June, 1906.    I saw no sign of wood cutting whatever thereon.    I went pretty well over the entire land.    I went to all four corners of the 80-acre tract of which that in controversy is a part.    I saw no signs of wood cutting or of posts having been gotten off the land.    No chips were to be seen anywhere on the land where I went along.    There was no fence around the old clearing which Travis Waters' fence is supposed to have once enclosed.    There were signs of an old clearing there, but from appearances it

has not been cultivated for years. The remains of an old fence that had rotted down could be seen, but there was no fence there then."

Plowden Richardson: "I, as agent for J. R. Saunders, who held a turpentine lease from J. Whiting Hyer, the plaintiff, boxed all the pine trees on the land in controversy. I had boxes cut in all the trees that were suitable for turpentine purposes. This was either the latter part of December, 1906, or the first part of January, 1907. A new wire fence was there around something like two acres of the land. At that time I boxed all the trees and up to the time this suit was brought, did all that was necessary to protect and care for the boxes. It took me about two weeks to do the work of boxing. No one warned me not to cut boxes or not to trespass on the land. There are a good many pine trees on the land and I boxed them all. I saw no signs warning trespassers to keep off. I boxed the trees inside the wire fence, too. Nobody objected. The boxing was done either in December, 1906, or in January, 1907."

In surrebuttal, Flem Brooks and E. A. Griffin testified on behalf of the defendants as follows:

Flem Brooks: "I Know when the trees were boxed on this land. It was all done in about two days' time. There were signs up warning trespassers to keep off. Don't know who put them up. They were not signed by anybody. Several signs were up on trees on the land."

E. A. Griffin: "Somebody slipped out there while I was in town and boxed the trees on this land. Notices were up warning trespassers to keep of. I had them put up. The boxing was all done before I knew it. It was all done in a very short time. Don't remember how long it took, only a very short time."

This is all the testimony which was introduced relating to the adverse possession of the land by the de-

fendants. We have copied it in full, in view of the conclusion which we have reached and for the further reason that as to adverse possession every case must stand largely upon its own merits, depending entirely upon the testimony.

Section 1721 of the General Statutes of 1906 defines the possession and occupation required to constitute adverse possession of land under color of title for the statutory period of seven years. Paragraphs 3 and 4 of division 2 of such section are as follows:

"3. Where (although not enclosed) it has been used for the supply of fuel, or for fencing timber for the purpose of husbandry, or for the ordinary use of the occupant; or

4. Where a known lot or single farm has been partly improved, the portion of such farm or lot which may have been left not cleared or not enclosed according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the part improved or cultivated."

Upon the testimony given in the case, it is only under these paragraphs that the defendants could possibly have recovered. Did the testimony show such adverse possession as is contemplated therein? We are of the opinion that this question must be answered in the negative. The following authorities will be found to be in point: DuPont v. Davis, 35 Wis. 631; Pepper v. O'Dowd, 39 Wis. 538; Mission of the Immaculate Virgin v. Cronin, 143 N. Y. 524, 38 N. E. Rep. 964. A comparison will show that the statutes in Wisconsin and New York are quite similar to the Florida statute relating to adverse possession. Also see Kendrick v. Latham, 25 Fla. 819, 6 South. Rep. 871; Townsend v. Edwards, 25 Fla. 582, 6 South. Rep. 212; Baars v Brace, 38 Fla. 265, 20 South. Rep. 991, and authorities there cited;

Gilbert v. Southern Land & Timber Co., 53 Fla. 319, 43 South. Rep. 754.

The evidence is not sufficient to support the verdict, and the court erred in denying the motion for a new trial. It follows that the judgment must be reversed.

COCKRELL and WHITFIELD, JJ., concur;

TAYLOR and PARKHILL, JJ., concur in the opinion.

HOCKER, J., (*concurring.*)—I concur in the conclusions of Chief Justice SHACKLEFORD. A large number of cases have been examined by me (inclusive of those of our own court) rendered in states having statutes similar to our own, *viz*: New York, Wisconsin and California, and no one has been found which holds that facts such as those testified to by Mr. Griffin are sufficient to give a title by adverse possession. They do not appear to be sufficiently notorious to put the true owner on notice that his land is being adversely held by some one else. Mr. Griffin says that he used the land for getting fuel for himself which was used or sold in Pensacola, some miles from the land, or on a farm upon which he lived situated a half mile from the land in dispute. He did not cut a tree from the land but used only dead wood. For aught that appears to the contrary he might have taken off the dead wood at night. The burden was on himself and wife to show by clear and satisfactory evidence a possession of the property adverse to the true owner. To use the language of this court in Gould v. Carr, 33 Fla. 523, 15 South. Rep. 259, "The adverse claimant must keep his flag flying, and present a hostile front to adverse possession. * * * It is something done by him. not merely that which is left undone by the owner that is to be considered. * * * Unless the adverse claimant is so in possession of the land that he may at any time be sued as a trespasser the

statute will not run in his favor." In Gilbert v. Southern Land & Timber Co., 53 Fla. 319, 43 South. Rep. 754, we said: "Every presumption is in favor of a possession in subordination to the title of the true owner, and an adverse possession as against such owner must be established by clear and positive proof." The Griffins cut no trees from the land, and so far as the evidence shows, left no sign upon it from which the owner might infer that it was being held adversely to him by some one else.