D. L. McKINNON, *Plaintiff in Error*, v. SETH JOHNSON AS ADMINISTRATOR *et al., Defendants in Error.*

1. Where a party elects to adopt one of several inconsistent remedies he cannot afterwards pursue the others or either of them even though he fails in the remedy elected and used. But where a party has several consistent remedies the mere adoption and use of one will not of itself preclude the use of the others under appropriate circumstances.

2. Where the election of a remedy assumes the existence of a particular status or relation of the party to the subject-matter of litigation, the party cannot afterwards pursue another remedy by which he assumes a different and inconsistent status or relation to the subject-matter.

3. Restitution proceedings and ejectment are not inconsistent or coextensive proceedings, but they are consistent and cumulative remedies.

4. A test of the identity of causes of action, for the purpose of determining the question of *res adjudicata*, is the identity of the facts essential to the maintenance of the actions. It is of the essence of estoppel by judgment that it be made certain that the precise facts were determined by the former judgment.

5. The facts necessary to be established in an action of ejectment are essentially different from those necessary in proceedings of restitution.

6. When the proof is not clear and positive of adverse possession and occupation of land for the full statutory period no title by adverse possession can be adjudged.

7.  Where the only acts of possession shown of wild lands and town lots is in "looking after them" and paying taxes on them, it is not error to direct a verdict against the party claiming title by adverse possession.

8.  Evidence tending to show adverse possession of lands considered, and after giving every possible probative force to the evidence no title by adverse possession is shown. ·

This case was decided by Division A.

Writ of error to the Circuit Court for Jackson County.

The facts in the case are stated in the opinion of the court.

*D. L. McKinnon,* for Plaintiff in Error;

*Liddon & Carter,* for Defendants in Error.

WHITFIELD, C. J.—This writ of error is to a judgment for the plaintiffs in an action of ejectment begun June 21, 1906. Trial was had upon a plea of not guilty, and the defendant undertook to show title by adverse possession under color of title. It was admitted that P. P. Johnson, the ancestor of the plaintiffs below had title to and possession of the property in controversy at his death in September, 1893. Seth Johnson testified that he took out letters of administration in Alabama on P. P. Johnson's estate, that he had possession of the lands since his father's death and rented them out; that "I have not been in possession of the land since February, 1898, until I was put in possession by writ of possession in the year 1908. I have never paid any taxes on it since 1897. I did not pay the taxes on it because there was a suit pending in the Supreme Court."

It appears that in February, 1893, P. P. Johnson entered into an agreement with A. D. McKinnon for the purchase of land from the latter. Subsequently P. P. Johnson died and A. D. McKinnon obtained a decree against Seth Johnson as administrator of the estate of P. P. Johnson, deceased, for a breach of the contract with A. D. McKinnon. A deficiency decree was issued for a balance adjudged to be due A. D. McKinnon for a breach of his contract with P. P. Johnson. Under an execution issued on the decree the lands in controversy belonging to the heirs of P. P. Johnson were levied upon and sold to D. L. McKinnon, the attorney for A. D. McKinnon. The decree under which the sale was made was reversed. Johnson v. McKinnon, 45 Fla. 388, 34 South. Rep. 272; McKinnon v. Johnson, 54 Fla. 538, 45 South. Rep. 451. Restitution proceedings were then begun by the heirs of P. P. Johnson to recover the possession of the lands sold under the revised decree. The petition for restitution was answered only by D. L. McKinnon, and the proceedings were admitted by the plaintiffs to have been abandoned. See Johnson v. McKinnon, 54 Fla. 221, 45 South. Rep. 23, 13 L. R. A. (N. S.) 874, 14 Ann. Cas. 180; McKinnon v. Johnson, 57 Fla. 120, 48 South. Rep. 910, upon former writs of error in this cause.

The plaintiff having rested, the defendant put in evidence the petition in the restitution proceeding. The separate answer of D. L. McKinnon to the petition was then offered in evidence by the defendant and it was objected to by the plaintiffs and the objection sustained. A demurrer to the answer and the ruling thereon were likewise excluded by the court.

The answer, demurrer thereto and the ruling thereon are not an estoppel as an election of remedies by the plaintiffs. They do not show *res adjudicata* of the subject-matter and they do not tend to show adverse possession

of the land in controversy by the defendant. No error is made to appear in the exclusion of these documents.

Where a party elects to adopt one of several inconsistent remedies he cannot afterwards pursue the others or either of them even though he fails in the remedy elected and used. But where a party has several consistent remedies the mere adoption and use of one will not of itself preclude the use of the others under appropriate circumstances. Where the election of a remedy assumes the existence of a particular status or relation of the party to the subject-matter of litigation, the party cannot afterwards pursue another remedy by which he assumes a different and inconsistent status or relation to the subject-matter. In restitution proceedings the relation or ownership of the property is assumed, though the question of title is not litigated. In ejectment the relation of ownership is likewise assumed and the title is a subject of controversy. Restitution proceedings and ejectment are not inconsistent or coextensive proceedings, but they are consistent and cumulative remedies. American Process Company v. Florida White Pressed Brick Company, 56 Fla. 116, 47 South. Rep. 942.

A test of the identity of causes of action, for the purpose of determining the question of *res adjudicata,* is the identity of the facts essential to the maintenance of the actions. It is of the essence of estoppel by judgment that it be made certain that the precise facts were determined by the former judgment. Prall v. Prall, 58 Fla. 496, 50 South. Rep. 867.

The facts necessary to be established in an action of ejectment are essentially different from those necessary in proceedings of restitution. Besides in this case the title and prior possession of plaintiff's ancestor are expressly admitted. Conceding that the ruling on the demurrer excluded by the trial court is a final judgment,

it is not *res adjudicata* with reference to the issues in this case. For a copy of the order and the issues possible in this proceeding, see McKinnon v. Johnson, 57 Fla. 120, 48 South. Rep. 910, text 913.

The defendant then put in evidence the deficiency decree in the case of A. D. McKinnon v. Seth Johnson *et al.*, and also as color of title the sheriff's deed dated February 9, 1898, conveying to defendant the land by virtue of an execution issued under the decree. As a witness the defendant testified that the sheriff's deed was executed to him, "and immediately, within two months, I went up there and over the land, and wherever there were any tenants on them, the tenants got off or accepted lease from me. As to the Linton place, Linton would not give it up and I brought an action of ejectment against him and obtained this judgment." Witness exhibited a judgment dated June 9, 1899, in his favor for the Linton land and testified: "I went up there during the term of court, as soon as I got through with my cases, as I didn't want the place to remain vacant more than I could help. That was in 1899. I had a renter on it the next year. * * * He remained there one or two years. * * * I rented the place every year after I took charge of it up to the time that the houses were burned down, and it never was vacant more than a few days at a time, and I collected the rent every year except the year 1898, up to the time the house burned down two or three years ago, since the suit was brought; there were two buildings on the places; the fence around a considerable portion of the land burned and then I only rented the houses until they were burned. I don't remember the names of all the renters. The Linton place is the W. $\frac{1}{2}$ and that portion of the E. $\frac{1}{2}$ of S. W. $\frac{1}{4}$ lying south of the Campbellton and Chipley wagon-road, Sec. 34, Tp. 5, N., R. 13 W., containing 165 acres more or less." I rented the Murphy place

\* \* \* all along until the houses became uninhabitable and no one would occupy them. \* \* \* I had tenants on it all along until two or three years ago when the houses became uninhabitable, since soon after I purchased it, not exceeding two months from the time I purchased. There is 120 acres in the Murphy place in Sec. 26; it is one 80 and a forty; there is another eighty just across the branch which is wild land. The Murphy place is the N. ½ of the N. W. ¼ of Sec. 26, and S. E. ¼ of the S. W. ¼ of Sec. 23; And I think the E. ½ of Sec. 24, is the other 80; the S. E. ¼ of the S. W. ¼, Sec. 30 is a way down on the railroad and is wild land. I went from two to four times a year to look after the land and see if any trespass had been committed upon it, and I had Mr. Richter and Mr. Bass looking after it. A little of the Murphy place that had already been turpentined, I rented for that purpose, but refused to allow any further boxing on it; the turpentining was in Sec. 26, and there may have been a little in Sec. 23, adjoining it. I don't know exactly where the line is, just rented what was already boxed." \* \* \*

"The wild lands I would go over and look after them, pay the taxes on them, and exercise the same acts of ownership I do over my other property I have. Neither the plaintiff nor any one else interfered with me while I was renting out these lands and going over them." \* \* \*

"There were houses on the Linton place, but I cannot say what part of the place they were on. Somewhere about the center, I would judge; some of it was fenced; there was about forty or fifty acres under cultivation, and there was a pear orchard on it. The year I got a judgment against Linton, it was cultivated by Linton. Linton claimed under Johnson. There wasn't very much crop there; it was in June; he had a little potato patch, cane patch. I don't know what it was, I did not find

Linton there; he was not there when I got there; he told me he would give up the place; he gave up the place, didn't have any crop." * * *

"It never was vacant after I took charge of it, only when one tenant moved out and another moved in. They cultivated the place every year up to the time the fences were burned; they did not cease to cultivate it until the fence was burned; the fence was kept up by me all the time until it was burned, and would keep out stock. It was burned in 1905 or first part of 1906. I am not sure about that." * * *

"I cannot tell the names of the renters I collected the rent from 1902, 3, 4, or 5. I don't know the last one I collected rent from; it may have been Wilkerson." * * * "All I did to the five acres in the Hagerman Addition to the Town of Chipley was to ride and walk over it in looking after it. I went right over it, never improved it, no fence was erected on it; lands in Section 24 and 30 are wild. A part of the time I had a portion of the Murphy place turpentined, where it had been boxed before, but refused to allow any new boxes cut on any of the land, although I had frequent applications to do it. I claimed under the Sheriff's deed. The Supreme Court afterwards declared it void. I claimed under the deed before and after it, the judgment of A. D. McKinnon against the plaintiffs, under which I purchased. The suit in which my deed was declared void was plaintiffs against myself a year or two ago, and I had been *holding* the lands for more than seven years consecutively; up to that time I was holding under my deed as title." * * * "After the Supreme Court decided my deeds void, which I think was in the early part of 1908; after that decision I only claimed it as color of title; I also claimed under a tax deed, ejectment judgment and adverse possession; the execution under which I purchased was my brother's,

and I was his counsel in the case; I did pay money for the land other than the costs; I gave him credit for it; it was credited on the execution and I gave him credit for it toð. I said that Johnson never interfered with me in controlling the lands. I was renting them out, paying taxes on them, keeping trespassers off them, and selling a part of them. * * * J. E. Cailey for the plaintiff testified: "I know the land in Section 34, T. 5. N., R. 13 W., near Chipley called the Linton place; have known it for eighteen or nineteen years. I have had occasion to notice it during the last ten years; during the last four or five years it has not been cultivated at all; prior to that time it was partially cultivated; it has not been continuously occupied all that time; there have been times when it was left vacant, not occupied before June, 1906. From 1898 to 1906, possibly half the time, it was not occupied; it was not cultivated every year, I don't think. A man by the name of Wilkerson cultivated it two years, that was about all of the cultivation it had. I think Linton left there about June or August 1898 or 1899, somewhere along there. The Pursely place in 26-5-13, I have known it for the same space of time; it has not been occupied continuously by any one before June, 1906; there was no cultivation of these at all; it has not been occupied more than a year, if that long; it has been vacant for ten years; no one in possession; the land in 24-5-13 lies in Alligator Creek mostly and not occupied by any one, for the last ten years; I mean the east half of 24-5-13. The S. E. ¼ of S. W. ¼ Sec. 30, is practically all swamp, except ten or fifteen acres, and has never been occupied, it is round timbered. I know lot 2, Block 1 in the Hagerman Addition to the Town of Chipley; it is vacant, not enclosed or cultivated; years ago it was, no house on it, never was. I have passed the Linton place once or twice a week looking after Dekle's

Johnson's and different parties lands. I could not tell you what date the place was vacant, it has been vacant for the last ten years." * * * "I would drive by there and nobody was there is how I know it was vacant. There was a part of the time before the fence was burned that it was not cultivated. * * * "I was all the time at Chipley, except a few months, and I say the Linton and Murphry places were not occupied half the time; and nobody at all occupied the Murphry place; never heard of anybody occupying it these ten years. The reason I know it I looked after the property of Mr. Johnson. I have been his agent, and was his agent at that time. I didn't know that D. L. McKinnon claimed to own it; don't know anything about it. * * *

It was admitted that the ancestor of the plaintiffs below "was seized of said lands and that title and possession thereof were in him at the time of his death." As the decree against the heirs of the decedent was reversed, and the sale to the defendant below was declared to be void, the title remains in the heirs of the decedent and the right to possession followed the title until another acquires title by adverse possession or otherwise. The admission of the administrator that he had not been in possession of the lands for about ten years, does not affect the rights of the other plaintiffs and does not show continuous adverse possession by the defendant.

The defendant D. L. McKinnon under the plea of not guilty undertook to prove title by adverse possession under color of title for the statutory period of seven years. Where a title by adverse possession under color of title is asserted the statute requires "a continued occupation and possession of the premises" "under the claim of title exclusive of any other right" "for seven years;" and provides that "land shall be deemed to have been possessed and occupied * * * (1) where it has been

usually cultivated or improved; (2) where it has been protected by a substantial enclosure; (3) where (although not enclosed) it has been used for the supply of fuel, or of fencing timber for the purpose of husbandry, or for the ordinary use of the occupant; or (4) where a known lot or single farm has been partly improved, the portion of such farm or lot which may have been left not cleared or not enclosed according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the part improved or cultivated."

There is no such clear and positive proof of possession and occupation of any of the lands by the defendant for seven years as to indicate that the jury erred in finding for the plaintiffs. The defendant does not give any data from which it can be inferred that he "possessed and occupied" any of the land in any of the ways contemplated by the statute, or in any way to show an actual, continuous possession or occupancy of any of the lands so as to give a title independent of the several methods of possession and occupancy expressly permitted by the statute.

The action was begun June 21, 1906, and the trial here reviewed was had June 19, 1909. The defendant testified that he "had been holding the lands for more than seven years consecutively;" but the facts testified to do not show the "holding" to have been any of the acts expressly allowed by the statute to be deemed a sufficient "possession of the premises." Assuming that when the defendant went upon the lands known as the Murphry place and leased it, "within two months" after February 9, 1898, he then entered into possession of the premises within the meaning of the statute, the defendant does not show with any degree of certainty that he continued to so possess and occupy the lands for the full period of seven years

in any of the ways indicated by the statute as being a sufficient possession and occupation. It is not shown that the lands were "usually cultivated or improved," or that they were "protected by a substantial enclosure," or that they were used for the supply of fuel or fencing timber, &c., or that it was a single farm partly improved, the remainder of it being "left not cleared or not enclosed according to the usual course and custom of the adjoining country." Independently of statutory methods of possession, it is not shown that the defendant was in actual, adverse, continued possession of the land for the period of seven years. Hyer v. Griffin, 55 Fla., 560, 46 South. Rep. 635.

The same may be said of the lands known as the Linton place except that the asserted possession began "during the term of court" after June 9, 1899, and this action was instituted June 21, 1906. As the only acts of possession shown of the wild lands and the town lots were that the defendant rode and walked over them in looking after them and paid taxes on them, the court did not err in directing a verdict for the plaintiffs as to them. Such acts of possession may be sufficient under a legal title, but they are inadequate to show the acquisition of title by adverse possession. Giving every possible probative force to the evidence in favor of the defendant does not show for him the acquisition of title by adverse possession under color of title in any of the ways permitted by the statute. This conclusion having been reached it is not necessary to consider other contentions made here, there being evidence in support of the finding as to mesne profits.

The judgment is affirmed.

SHACKLEFORD and COCKRELL, J. J., concur;

TAYLOR, HOCKER and PARKHILL, J. J., concur in the opinion.

Petition for rehearing in this case denied.